[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 22, 2002
THOMAS K. KAHN
CLERK

Nos. 99-15197, 00-12759

D. C. Docket No. 97-00052 CR-FTM-24D

UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

                     versus

ROBERT W. WHITESIDE,
JAY A. JARRELL,

                                        Defendants-Appellants.

Appeals from the United States District Court
for the Middle District of Florida

**(March 22, 2002)**

Before EDMONDSON, DUBINA and COX, Circuit Judges.

DUBINA, Circuit Judge:

In Appeal No. 99-15197, appellants Robert Whiteside and Jay Jarrell appeal their criminal convictions and sentences for making false statements in Medicare/Medicaid and CHAMPUS reimbursement cost reports and for conspiracy to defraud the government by making false statements in those cost reports. In Appeal No. 00-12759, the defendants appeal the district court's order denying them access to sealed documents. Based on our review of the voluminous record in Appeal No. 99-15197, we reverse the defendants' convictions and sentences in light of the government's failure to prove that the alleged statements were knowingly and willfully false. In Appeal No. 00-12759, we affirm the district court's order denying access.

## Appeal No. 99-15197

### I. BACKGROUND

**A. Overview of Programs**

Medicare is a federal health insurance program designed to provide medical services, medical equipment and supplies to persons 65 years of age and older and to blind and disabled persons. Congress established Medicare through Title XVIII of the Social Security Act, 79 Stat. 291 (1965) (current version at 42 U.S.C. §§ 1395-1395vv (1994)). The United States Department of Health and Human Services ("HHS") funds and administers Medicare. The Health Care Financing

Administration ("HCFA"), an agency within HHS, manages the Medicare program. Medicaid and the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS") provide similar coverage, respectively, for the indigent and armed services retirees and dependents of active duty members. The three programs function essentially the same. To illustrate their function, we will discuss the Medicare program.

Medicare Part A covers the cost of hospital services and related care, and reimburses hospitals for services provided to its beneficiaries by means of a prospective payment system ("PPS"). Medicare groups standardized medical codes for patients, diseases, and procedures into diagnostic related groups ("DRG") that provide the basis for PPS. The average cost of care for each DRG determines the reimbursement amount, rather than the actual cost of care to a beneficiary. A hospital that elects to participate in the Medicare Part A program is known as a provider. The provider enters into a contract with HCFA in which the provider agrees to conform to the provisions of the Social Security Act ("SSA") and applicable sections of the Code of Federal Regulations ("CFR") during its participation in the program.

Under the Medicare program, a provider files annual cost reports setting forth information and calculations identifying the Medicare costs that the hospital

claims should be reimbursed by Medicare for that year. The cost reports include a certification that each cost report filed is true, correct, complete, and prepared from the books and records of the provider. The cost reports also contain an acknowledgment of the following statement: "INTENTIONAL MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW." In preparing cost reports, providers often utilize outside accounting firms as consultants.

The cost reports allocate portions of overhead costs, such as employee salaries and benefits, supplies, and utilities to each of the reimbursable costs as administrative and general ("A&G") costs. Medicare factors these A&G costs into the PPS/DRG reimbursement and administers the reimbursement throughout the fiscal year in periodic interim payments ("PIPs"). Other costs which secure real property or other capital assets, such as depreciation, interest on certain long term debt, and lease expenses, are capital related costs. Medicare reimburses capital costs in a different manner, and as a result, these costs are more financially beneficial to the provider. The breakdown and reclassification of certain capital costs occur in schedules known as worksheets "A-6" and "A-8" in the cost reports.

The providers file the cost reports with insurance companies that contract with HHS to be fiscal intermediaries ("FI"). The FI administers the Medicare program and distributes Medicare funds based upon the claims included by the providers in their cost reports. The FI is responsible for reviewing the cost reports and processing payment of claims. After an audit process, the FI's cost report review culminates in a Notice of Program Review ("NPR"), or final settlement. Both the FI and the provider have a three-year period in which to reopen a cost report in order to make changes. In the event of a claims dispute between the FI and the provider, the provider can either appeal an audit adjustment, or claim the disputed cost. If the provider claims the disputed cost, it must disclose to the FI the claimed item in the cost report itself, on the protest line or the settlement page, or in the transmittal letter that accompanies the filed cost report.

## B. Facts

Basic American Medical, Inc. ("BAMI") owned and operated several hospital facilities in southwest Florida that participated in the Medicare, CHAMPUS, and Medicaid programs as providers, including Fawcett Memorial Hospital ("Fawcett"). By the late 1980's, Fawcett was BAMI's second largest hospital, and Medicare reimbursement constituted over 30% of the revenue of BAMI's hospitals. In 1981, Fawcett borrowed $14,001,000 from Manufacturers

5

Hanover Trust Company ("the Manufacturers loan") and used that money to refinance five other loans – three that previously had been treated as capital-related and A&G; one that had been treated as 100% capital-related; and one that had been treated as 100% A&G. In its 1981 cost report, Fawcett claimed the Manufacturers loan interest as 100% capital-related, but the FI adjusted that to 46%.

In 1982, Fawcett changed its fiscal year's end from October 31 to December 31, and consequently, filed two cost reports that year. Providers Reimbursement Consultants ("PRC"), Fawcett's consultant, prepared the 1982 cost reports. In both cost reports, Fawcett claimed the interest on the Manufacturers loan as 100% capital-related. The FI again adjusted the interest to 46% capital-related. In 1983, Fawcett paid off the Manufacturers loan with a loan obtained from Northwestern National Life Insurance Company ("Northwestern"). Citizens Fidelity Mortgage serviced the Northwestern loan. ("the Citizens loan"). Northwestern assumed an existing first mortgage of $2,088,768, and the $2,065,000 balance went to Fawcett. In its 1983 cost report, Fawcett claimed interest on the Citizens loan as 46% capital-related, and the FI reduced this to 39% capital-related. Fawcett's 1984 cost report claimed the Citizens loan interest as 39% capital-related and 61% A&G, consistent with the FI's treatment of the interest in the 1983 cost report.

Appellant Jay Jarrell ("Jarrell") began working for BAMI in 1985 as vice-president of finance. Fawcett's 1985 cost report claimed the Citizens loan interest as 100% capital-related. Harold Bachner ("Bachner"), a PRC principal, testified at trial that PRC had made a mistake in the 1985 cost report because it had not properly reclassified the non-capital portion of the interest to A&G. Bachner was unsure when PRC discovered the mistake, but stated that PRC did not tell the FI about the mistake. The FI later adjusted the interest for the Citizens loan to 39% capital-related, but applied the 39/61% split to all Fawcett loans.

Fawcett's 1986 cost report claimed the Citizens loan interest as 45% capital-related. Subsequently, Jarrell asked PRC to amend the 1986 cost report to claim the interest as 100% capital-related. PRC worried about amending the 1986 cost report because it was likely to expose the mistake in the 1985 cost report in which Fawcett had claimed the interest as 100% capital-related. During the audit of the 1986 cost report, PRC submitted an amended cost report, at BAMI's request, claiming the Citizens loan interest as 100% capital-related, but PRC did not use the protest line on the cost report. The transmittal letter stated that BAMI submitted the amended report to correct "material errors and omissions." Initially, the FI rejected the amendment to the 1986 cost report; however, another FI later adjusted it to 39% capital-related and applied the split to all Fawcett loans.

BAMI had no reimbursement director before 1989, so co-defendant Lynn Dick ("Dick"), BAMI's corporate controller, and Jarrell controlled filing the 1987 and 1988 cost reports. The 1987 cost report claimed the Citizens loan interest as 100% capital-related, basing this on the amended 1986 cost report, which had claimed the Citizens loan interest as 100% capital-related. Jerry Lenon ("Lenon"), PRC's vice-president, advised Dick that if Fawcett's 1988 cost report acknowledged that part of the interest was A&G – consistent with the 1985 NRP – Fawcett would owe Medicare approximately $650,000. Lenon suggested that, if Fawcett claimed the interest as 100% capital-related on the 1988 cost report, it should do so on the protest line to flag it for the auditor and to preserve Fawcett's appeal rights. Jarrell and Dick told Lenon that they disagreed with his proposal for treatment of the interest. They firmly believed that the interest was 100% capital-related. Lenon informed Jarrell and Dick that claiming the interest as 100% capital-related might be fraud so he demanded that BAMI send him a letter directing him to file the 1988 cost report claiming the interest as 100% capital-related.

In 1989, William Steven Dudley ("Dudley") became BAMI's Corporate Director of Reimbursement, responsible for overseeing cost report preparation for BAMI's Florida hospitals. After reviewing the debt and interest classifications in

8

Fawcett's cost reports, Dudley concluded that, as of late 1984, the interest for the Citizens loan was 39% capital-related and 61% A&G. Dudley sent Jarrell a memo stating that Fawcett's records supported only a 39/61% split in the interest. Later, Dudley reported to Jarrell and Dick that the FI's calculations for 1986 were inaccurate and that BAMI would be able to recoup reimbursement due to that miscalculation, but that Fawcett's records would not support treatment of the interest as 100% capital-related. Jarrell was displeased with Dudley's report because he believed that, since BAMI was short on cash, all the interest paid in a year should be treated as capital-related if BAMI's expenditures for capital assets were greater than its cash on hand.

In October 1989, Dudley contacted the FI and told her that BAMI disagreed with her interest calculations for 1986, and the FI agreed to reopen the cost reports for 1984 through 1986. The FI later proposed that Fawcett's interest for 1984 through 1986 be readjusted by applying the 39/61% split to the Citizens loan only. BAMI did not object, and as a result of these adjustments, Fawcett received over $135,000 in additional Medicare reimbursement for 1985 and 1986. Price Waterhouse prepared the 1989 cost report consistent with the 39/61% split for the Citizens loan interest.

In 1990, BAMI dismissed Price Waterhouse and hired KPMG Peat Marwick ("KPMG") to prepare its cost reports. Also in 1990, Fawcett received the NPR for its 1987 cost report, indicating that Medicare would reimburse Fawcett $118,273. Dudley testified that if the FI had properly adjusted the Citizens loan interest on the 1987 cost report, Fawcett would have owed the government approximately $400,000. After reviewing the 1987 NPR, Dudley contacted Dick and told him that BAMI was going to benefit from the FI's mischaracterization of the interest in Fawcett's 1987 cost report, and it was likely that the FI would treat the 1988 interest as 100% capital-related, so Fawcett should receive additional reimbursement for 1988.

Following other discussions regarding the characterization of the Citizens loan interest, Dick suggested that BAMI seek legal counsel. Dick conversed with Norman Tabler ("Tabler"), a partner at BAMI's primary law firm, and Dudley sent summaries to Tabler regarding the Citizens loan interest. Dudley testified at trial that the summaries included some inaccuracies, but they were not done purposefully. Tabler told Dick and Dudley that BAMI was not obligated to inform the government about the mistake in its treatment of the interest in Fawcett's cost reports. At trial, Tabler testified that if he had known that Fawcett's books and records supported only the 39/61% split, his advice would have been different.

Subsequently, Jarrell, Dick, and Dudley discussed filing an amended cost report for 1989, claiming the interest as 100% capital-related, as the FI had allowed in the 1987 and 1988 cost reports. Jarrell instructed Dudley to prepare a letter to the FI, asking to file an amended cost report for 1989 to claim the Citizens loan interest as 100% capital-related. When Dudley sent the letter and the amended cost report, he used the figures from work papers for the reserve cost reports and "flipped" the numbers for the interest. The FI did not accept the amended cost report. In reviewing the 1988 cost report and the original 1989 cost report, the FI discovered inconsistencies in the interest claims. The FI sent Dudley a letter asking for a supporting schedule for the interest reclassification for Fawcett's 1989 cost report. Dudley responded and sent Price Waterhouse's work papers which purported to support the interest reclassification. Price Waterhouse's actual working papers showed that the Citizens loan interest was 39% capital-related, but Dudley falsified the papers to be sent to the FI. In February 1992, the FI informed Dudley that it had reclassified Fawcett's interest as 100% capital-related for the 1989 cost report.

In April 1992, Columbia purchased BAMI. That same month, KPMG sent Dudley a memorandum indicating that Fawcett would sustain a $512,055 reduction in Medicare reimbursement if its 1991 cost reports claimed the Citizens loan

11

interest as only 39% capital-related.  Fawcett filed its 1991 cost report, claiming

100% capital-related interest on the Citizens loan.  In May 1992, the FI sent

Dudley a letter indicating that it had not adjusted the Citizens loan interest in

Fawcett's 1990 cost report.  Subsequently, the FI issued the 1988 NPR, indicating

that it allowed the Citizens loan interest as 100% capital-related.  Medicare

reimbursed Fawcett $184,593.

In July 1992, Dudley left Columbia, and Columbia paid the $15,829,574

balance of Fawcett's Citizens loan.  Dick also left his employment with Columbia.

In September, Robert Whiteside ("Whiteside") became Columbia's Manager of

Reimbursement Services.  Soon thereafter, co-defendant Michael Neeb ("Neeb")

became CFO of Fawcett.  In 1993, Columbia hired John Schilling ("Schilling") as

its Supervisor of Reimbursement Services.  Fawcett's 1992 and 1993 Medicare

cost reports claimed the Citizens interest as 100% capital-related.

In the spring of 1994, the FI called Schilling regarding prior re-openings of

Fawcett's cost reports.  Schilling reported this to Whiteside, who told Schilling that

an FI had made a mistake during a previous audit.  Whiteside indicated that jobs

could be lost because of this mistake and he instructed Schilling to gather

information concerning the matter for a meeting with Neeb and Jarrell.  Jarrell

testified that he did not recall this particular meeting, but Whiteside stated that he

12

included Jarrrell in this meeting during which the participants discussed ways to divert the FI's attention from the interest issue. Whiteside and Jarrell both testified that this "diversion" discussion was a joke. Soon thereafter, Whiteside left his employment.

### C. Qui Tam Action

In February 1995, Schilling contacted a law firm about filing a claim pursuant to the *qui tam* provisions of the False Claims Act. Schilling did not inquire whether he should disclose the interest issue to the FI. Schilling resigned from Columbia in August 1995, but before he left, he collected four boxes of evidence and sent these to an attorney. Subsequently, Schilling filed *qui tam* actions against Columbia and KPMG, which the government joined. Three months later, Schilling met with a Federal Bureau of Investigation ("FBI") agent and an Assistant United States Attorney ("AUSA") and eventually agreed to cooperate in a criminal investigation. Later, Schilling returned to Columbia to obtain general information about Columbia for the FBI.

### D. Procedural History

A grand jury indicted Whiteside, Jarrell, and Neeb for conspiracy to commit an offense against or to defraud the United States, in violation of 18 U.S.C. § § 371 and 2. The grand jury also indicted the defendants for making false statements in

13

applications for Medicare/Medicaid benefits and payments to a department of the United States, in violation of 42 U.S.C. § 1320a-7b and 18 U.S.C. §§ 1001 and 2. A second grand jury re-indicted the defendants and added Dick to the conspiracy charge. The grand jury also charged Whiteside, Jarrell, and Neeb with false statement offenses and obstructing or impeding a federal auditor in performance of the auditor's official duties, in violation of 18 U.S.C. §§ 1516 and 2. The indictment alleged that the conspiracy lasted from at least 1990 to July 1998, and it based the substantive charges upon specified cost reports filed for 1992 and 1993.

Following a two-month trial, the jury returned verdicts of not guilty for all the defendants on the obstruction charge, a not guilty verdict for Neeb on all counts, and guilty verdicts against Whiteside and Jarrell on the conspiracy and false statement charges. The jury was unable to reach a verdict on the conspiracy count against Dick, so the district court declared a mistrial on that count. The district court sentenced Whiteside and Jarrell to concurrent terms of imprisonment of 24 and 36 months, respectively, to be followed by concurrent 36 month terms of supervised release. Whiteside and Jarrell then perfected their appeals.

## II. ISSUES

14

1. Whether the government proved beyond a reasonable doubt that the defendants knowingly and willfully filed false statements in the Medicare/Medicaid and CHAMPUS cost reports.

2. Whether the government proved beyond a reasonable doubt that the defendants conspired to defraud the government by filing false cost reports.

3. Whether the government complied with its discovery obligations.

4. Whether the government improperly utilized the grand jury proceedings.

5. Whether the district court erred in its jury instructions.

6. Whether the district court properly sentenced the defendants.

## III. DISCUSSION[1]

*False Statement Convictions*

This seemingly complex case involves a single allegedly false statement which classified debt interest as 100% capital-related on cost reports submitted to the government for Medicare/Medicaid reimbursement. The government contends that Fawcett's classification of the interest expense based on how the debt was

---

[1] In light of our decision reversing the defendants' convictions for filing false statements with the government, we need not discuss the remaining issues raised by the defendants. We do comment, however, on defendants' conspiracy convictions. Since the defendants' act of submitting the cost reports was not an illegal act, it follows *a fortiori* that defendants' alleged "agreement" to submit those cost reports was not a criminal conspiracy. *Parr v. United States*, 363 U.S. 370, 393, 80 S.Ct. 1171, 1184 (1960) (holding that if a conviction on substantive count cannot stand, neither can conviction for conspiring to commit that offense); *see also United States v. Curran*, 20 F.3d 560, 571 (3rd Cir. 1994). Accordingly, we also reverse defendants' conspiracy convictions.

15

being used at the time of the filing of the cost report rather than how the funds were used at the time of the loan origination was inconsistent with the Medicare regulations.  Defendants contend that no Medicare regulation or other authority exists that indicates that this characterization of debt interest was incorrect, much less "knowingly and willfully" false.  In sum, defendants contend that the government failed to prove that the statements at issue were not a reasonable interpretation of ambiguous Medicare reimbursement requirements; thus, the government failed to prove the statements were knowingly and willfully false.

In a case where the truth or falsity of a statement centers on an interpretive question of law, the government bears the burden of proving beyond a reasonable doubt that the defendant's statement is not true under a reasonable interpretation of the law.  *United States v. Migliaccio*, 34 F.3d 1517, 1525 (10th Cir. 1994) (holding that the government bears the burden to negate any reasonable interpretations that would make the defendant's statement correct); *United States v. Johnson*, 937 F.2d 392, 399 (8th Cir. 1991) (holding that one cannot be guilty of a false statement beyond a reasonable doubt when his statement is a reasonable construction); *United States v. Race*, 632 F.2d 1114, 1120 (4th Cir. 1980) (same); *United States v. Anderson*, 579 F.2d 455, 460 (8th Cir. 1978) (same); *see also United States v. Calhoon*, 97 F.3d 518, 526 (11th Cir. 1996) (noting that even though the Medicare

16

regulations were clear regarding the royalty fees paid to a related party, the government failed to establish as a matter of *fact* that the fees claimed were actually in excess of what was clearly allowed under the regulations, and thus, had "failed to sustain its burden to prove the claim false by virtue of the nonreimbursable nature of the interest").

The government cannot meet its burden in this case because, despite its contention to the contrary, no Medicare regulation, administrative ruling, or judicial decision exists that clearly requires interest expense to be reported in accordance with the original use of the loan. *See United States v. Harris*, 942 F.2d 1125, 1132 (7th Cir. 1991) (reversing conviction for willful false statement because the "usual sources of authority are silent" on the statement at issue). The government's position that the regulation is pellucid on this point is refuted by the relevant text of the regulation. That regulation defines "capital-related interest expense" as "the cost incurred for funds borrowed for capital purposes." 42 C.F.R. § 413.153(b)(1) (2000). The regulation's language indicates that an interest expense is capital-related when the underlying debt is capital-related, but it does not explain how to define the underlying debt; that is, whether the initial use of the loan proceeds provides the sole basis for the debt's character. One of the government's witnesses – the FI auditor who first examined the Fawcett interest

17

issue – testified that the regulations do not answer the specific question of whether the character of interest can change from capital to operating, and in fact "can be interpreted different ways." (R. Vol. 44, p. 238.)

Administrative authority also refutes the government's position. In 1978, HCFA officially endorsed Administrative Bulletin 1186, which explicitly stated that "the character of a loan may change over time." (Jarrell Ex. 454.) This bulletin specifically announced that funds that are initially "unnecessary borrowing" under the Medicare regulations can later be described as "necessary borrowing" upon certain changes in the financial position of the borrower. *Id.* The administrative publication implies a substance over form theory that has been reinforced and applied in a capital reimbursement review proceeding. *See Santa Maria Hosp. v. Blue Cross & Blue Shield Ass'n*, [1991-1992 Transfer Binder] *Medicare and Medicaid Guide* (CCH) ¶ 39, 697, PRRB Hearing Dec. No. 91-D81, Sept. 20, 1991) (holding that the FI properly reclassified interest expense associated with borrowing from the cost center for capital-related costs to the cost center for A&G expenses). This theory also comports with the logical notion that money is fungible. For that reason, the defendants' interpretation that the Medicare regulations authorized the treatment of debt interest as capital-related

was not unreasonable, even if the funds underlying the debt were initially used for non-capital purposes.

Neither the regulations nor administrative authority clearly answer the dilemma the defendants faced here. As the FI testified, under current law, reasonable people could differ as to whether the debt interest was capital-related. The testimony indicates that the experts disagreed as to the validity of the theory of capital reimbursement suggested by the government. This contradictory evidence lends credence to defendants' argument that their interpretation was not unreasonable. Here, "competing interpretations of the applicable law [are] far too reasonable to justify these convictions." *United States v. Mallas*, 762 F.2d 361, 363 (4th Cir. 1985). As such, the government failed to meet its burden of proving the *actus reus* of the offense – actual falsity as a matter of law.

Accordingly, we reverse defendants' convictions and sentences.


## Appeal No. 00-12759

In this separate but related appeal, defendants contend that the district court erred in denying their motion for access to sealed documents so they might properly prepare and argue their case in Appeal No. 99-15197. Our disposition of defendants' convictions and sentences pretermits an in depth discussion on this

issue. After an *in camera* review of the documents, however, we hold that the district court did not err in denying defendants' motion to unseal the FBI 302 reports of interviews and the transcribed taped conversations of key government witness John Schilling.

## V. CONCLUSION

In Appeal No. 99-15197, we reverse defendants' convictions and sentences because the government failed to meet its burden of proving the *actus reus* of the offenses. In Appeal No. 00-12759, we affirm the district court's order denying defendants' access to sealed documents.

**REVERSED in part, AFFIRMED in part.**