**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 19-1105

_____

UNITED STATES OF AMERICA

v.

ROBERT V.A. HARRA, JR.,
                              Appellant

_____

On Appeal from the United States District Court
for the District of Delaware
(D. Del. No. 1:15-cr-00023-003)
Hon. Richard G. Andrews, United States District Judge

_____

No. 19-1136

_____

UNITED STATES OF AMERICA

v.

DAVID GIBSON,
                              Appellant

_____

On Appeal from the United States District Court
for the District of Delaware
(D. Del. No. 1:15-cr-00023-002)
Hon. Richard G. Andrews, United States District Judge

_____

No. 19-1190
_____

UNITED STATES OF AMERICA

v.

WILLIAM B. NORTH,
                              Appellant

_____

On Appeal from the United States District Court
for the District of Delaware
(D. Del. No. 1:15-cr-00023-004)
Hon. Richard G. Andrews, United States District Judge

_____

No. 19-1237
_____

UNITED STATES OF AMERICA

v.

KEVYN N. RAKOWSKI,
                              Appellant

_____

On Appeal from the United States District Court
for the District of Delaware
(D. Del. No. 1:15-cr-00023-005)
Hon. Richard G. Andrews, United States District Judge

_____

Argued June 30, 2020

Before: KRAUSE, PHIPPS, and GREENBERG, *Circuit
Judges*

(Filed: January 12, 2021)

Sharon D. Feldman
Andrew M. Lawler
641 Lexington Avenue, 15th Floor
New York, NY 10022

Avram D. Frey
Cambria County Office of District Attorney
200 South Center Street
Cambria County Court House
Ebensburg, PA 15931

Jennifer A. Hradil
Lawrence S. Lustberg          [**ARGUED**]
Elizabeth A. Mancuso
Thomas R. Valen
Gibbons
One Gateway Center
Newark, NJ 07102

Michael P. Kelly
Steven P. Wood
McCarter & English
405 North King Street
Renaissance Centre, 8th Floor
Wilmington, DE 19801

Geoffrey N. Rosamond
McCarter & English
100 Mulberry Street
Four Gateway Center, 14th Floor
Newark, NJ 07102

*Counsel for Appellant Robert V.A. Harra, Jr.*

Kenneth M. Breen
Phara A. Guberman
John P. Nowak
Jena A. Sold
Paul Hastings
200 Park Avenue, 30th Floor
New York, NY 10166

3

Stephen B. Kinnaird
Paul Hastings
2050 M Street, N.W.
Washington, DC 20036

     *Counsel for Appellant David Gibson*

Andrea S. Brooks
Russell S. Nolte
David E. Wilks
Wilks Law
4250 Lancaster Pike, Suite 200
Wilmington, DE 19805

Thomas A. Foley
1905 Delaware Avenue
Wilmington, DE 19806

George W. Hicks, Jr.     [**ARGUED**]
Aaron L. Nielson
Kirkland & Ellis
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004

     *Counsel for Appellant William B. North*

Andrew C. Dalton
Bartholomew J. Dalton
Ipek K. Medford
Dalton & Associates
1106 West 10th Street
Cool Spring Meeting House
Wilmington, DE 19806

Henry E. Klingeman     [**ARGUED**]
Klingeman Cerimele
60 Park Place, Suite 1100
Newark, NJ 07102

     *Counsel for Appellant Kevyn N. Rakowski*

Robert F. Kravetz     [**ARGUED**]
Jamie M. McCall
Lesley F. Wolf
Office of United States Attorney

1313 North Market Street
Hercules Building, Suite 400
Wilmington, DE 19801

*Counsel for Appellee United States of America*

_____

**OPINION OF THE COURT**

_____

KRAUSE, *Circuit Judge*.

When a defendant is charged with false reporting based on an ambiguous reporting requirement, what is the prosecution's burden at trial as to the element of falsity? Is it sufficient for the prosecution to prove the statement was false only under the Government's interpretation of the requirement, or must it prove the statement was false under each objectively reasonable interpretation of the requirement? In the balance hang the convictions of four former executives of Wilmington Trust Corporation, a bank that, in the wake of the Great Recession of 2008, excluded certain commercial real estate loans from those it reported as "past due" to the Securities and Exchange Commission and the Federal Reserve. The executives maintained that, under a reasonable interpretation of these requirements, the exclusion of the loans was proper, but the District Court denied their requests to introduce evidence concerning or instruct the jury about that alternative interpretation. The jury then found the executives' reporting constituted "false statements" for purposes of 18 U.S.C. § 1001, 15 U.S.C. § 78m, and related statutes and convicted Defendants on all counts.

We hold today that to prove falsity beyond a reasonable doubt in this situation, the Government must prove either that its interpretation of the reporting requirement is the only objectively reasonable interpretation or that the defendant's statement was also false under the alternative, objectively reasonable interpretation. And because the Government here produced insufficient evidence from which a rational jury could find Defendants' statements false under this rule, we will reverse Defendants' false statements convictions and remand on those counts for entry of judgments of acquittal. As for Defendants' conspiracy and securities fraud convictions,

5

however, which were charged in the alternative on an independent theory of liability, we will vacate and remand for retrial.

## I. BACKGROUND

### A.     The Bank's Internal Practices

For many years before the Great Recession, Wilmington Trust maintained a significant commercial real estate lending practice. This department responsible for this practice issued "term loans," meaning the borrower would make monthly interest payments and repay the principal sum at "maturity," i.e., the date "set forth in the promissory note and the loan agreement." A5977–78; *see, e.g.*, A11755 (requiring "payment of all outstanding principal plus all accrued unpaid interest" on the date of maturity as well as "regularly monthly payments of all accrued unpaid interest" on a monthly basis). Because the loans typically financed construction projects, those terms were short—two or three years—and, upon their expiration, the loans could be repaid, extended, or refinanced. A3040. Extensions were commonplace in this context, and the Bank's loan documents reserved its right to "renew or extend (repeatedly and for any length of time) this loan . . . without the consent of or notice to anyone." A11756.

For purposes of its internal classification of such loans, the Bank did not classify all mature loans with unpaid principals as past due. Instead—so long as loans were in the process of renewal and interest payments were current—the Bank did not classify those loans as "past due," even if the maturity date had passed. This treatment of the loans internally was known as a "waiver practice."

Through most of Wilmington Trust's history, the waiver practice had been a relatively minor feature of the Bank's portfolio. But this changed dramatically in 2009. By that point, the Bank had taken on an increasing number of commercial real estate loans, many with maturity dates around the same time. When borrowers on these loans were unable to repay their principals with the advent of the Great Recession, the volume of mature loans without full principal repayment exploded, ballooning to $303.6 million in total by year-end 2009.

6

The effect on the Bank's reporting was commensurate: As the Bank applied its pre-existing waiver practice to many of these loans, the discrepancy between matured, non-repaid loans and Bank-defined "past due" loans ballooned as well. *See* A5359–65, A7740 ($8.5 million reported, $296.6 million in all).

The Bank reacted to this unprecedented volume in several ways. First, it approved mass extensions of loans that had matured or were nearing maturity. Second, for reasons not entirely clear, in July 2010 the Bank changed its waiver practice, resolving that "[a]ll matured/current loans" would be "reported in [the] Past Due numbers." A11044. Ultimately, however, the Bank was unable to weather the financial crisis unscathed. By the third quarter of 2010, a substantial number of loans were past due or placed on nonaccrual; the Federal Reserve issued a "troubled condition" letter, A3528; and by November 2010 the Bank had merged with M&T Bank.

## B. Wilmington Trust's Regulatory Oversight

Wilmington Trust's internal classification of its loans also carried over to its external reporting of loans so that, when required to report "past due" loans, it excluded the "waived" loans, which it treated as current. As a federally insured bank and a publicly traded company, Wilmington Trust reported to, as relevant here, three regulators: the SEC, the Fed, and the Office of Thrift Supervision (OTS), an agency within the Department of the Treasury that has since merged with the Office of the Comptroller.[1] Each of these regulators required the Bank to report "past due" loans and, while none gave a definition, each described the reporting requirement in slightly different terms.

The SEC, in its "Industry Guide" for bank holding companies, instructed the Bank to identify "[a]ccruing loans which are *contractually past due* 90 days or more as to principal *or* interest payments." A9219 (emphasis added); *see also* 17 C.F.R. § 229.303(a)(1) instruction 13 (directing "bank holding companies" to the "information called for in Guide 3" when

---

[1] Defendants were not charged with making false statements to the OTS.

preparing quarterly and annual reports). The SEC provided no further guidance on the meaning of "past due."

The Fed, in its instructions to banks submitting quarterly "call reports," also used the word "contractual" to define "past due loans": It required the Bank to report "all loans . . . that are past due," with "[t]he past due status of a loan . . . determined in accordance with its contractual repayment terms." A9622. The Fed's instructions (the "call report instructions") then went further, stating that "grace periods allowed by the bank after a loan . . . has become past due but before the imposition of late charges are not to be taken into account," *id.*, and clarifying, in relevant part, that loans "are to be reported as past due when either interest *or* principal is unpaid in the following circumstances":

> (3) Single payment and demand notes, debt securities, and other assets providing for the payment of interest at stated intervals are to be reported as past due after one interest payment is due and unpaid for 30 days or more.

> (4) Single payment notes, debt securities, and other assets providing for the payment of interest at maturity are to be reported as past due after maturity if interest *or* principal remains unpaid for 30 days or more.

A9622–23.

The Bank's third regulator, OTS, also provided an "instruction manual" directing Wilmington Trust to "[r]eport all loans . . . that are contractually past due" and, much like those from the Federal Reserve, specifying that "grace periods" should not be "take[n] . . . into account when determining past due status." A12399. OTS also tracked the language of the Fed's "Circumstance 3" and "Circumstance 4" to describe its requirement, instructing that loans should be reported "as past due when *either interest or principal* is unpaid in the following circumstances":

> c) Single payment and demand notes providing for the payment of interest at stated intervals (such as certain construction loans) after one

8

interest payment is due and unpaid for 30 days or more.

d) Single payment notes providing for the payment of interest at maturity if interest or principal remains unpaid for 30 days or more after maturity.

*Id.* (emphasis omitted).

Unlike the Fed, however, OTS provided further guidance as to the meaning of these circumstances in the form of Q&As on its website. Importantly for our purposes, one such question asked about a situation—akin to the Bank's waiver practice—where "construction loans that require interest-only payments due monthly with the principal due at maturity" were past maturity but current on interest. A12509. The response posted by OTS was that:

> If management has restructured or extended a loan—formally or informally[—]*then the loan would not be past due*. An informal extension (not the same as a restructuring) is when the bank has agreed to accept interest payments until the property is rented or sold. The extension should be for a limited and reasonable length of time[,] and the bank should get the extension in writing. From the borrower's perspective, if he is doing what the bank has told him, the loan is not in default and does not have to be reported . . . .

*Id.* (emphasis added).

All parties agree that apart from these sources, there are no statutory or regulatory definitions illuminating the definition of "past due" or explaining how that term should be applied to term loans past maturity but current on interest.

## C.    Procedural History

In August 2016, a grand jury returned a Third Superseding Indictment (the Indictment) charging Gibson, Harra, North, Rakowski, and the Bank with conspiracy to defraud the United States, commit securities fraud, and make false statements to

9

regulators in violation of 18 U.S.C. § 371 (Count One); securities fraud in violation of 18 U.S.C. § 1348 (Count Two); making false statements to the SEC and Federal Reserve in violation of 18 U.S.C. § 1001 and 15 U.S.C. § 78m (Counts Three through Sixteen); and falsely certifying financial reports in violation of 18 U.S.C. § 1350 (Counts Seventeen through Nineteen, as to Gibson only).[2] Every offense with which Defendants were charged involved the alleged falsity of the Bank's reporting of "past due" loans.[3] As the Government puts it, the "starting point" for each charge "[wa]s that Defendants knew that the . . . past due loan statements were false" but nonetheless made them with the requisite criminal intent. Appellee's Br. 123.

The Government separately contends that the mass extensions mentioned above formed an alternate basis for liability for the conspiracy and securities fraud counts, independent of any false statements. Under this "extend and pretend" scheme, the Government charged the Defendants with extending the maturity date of soon-to-come-due loans without adequate investigation or underwriting, in order to hide the scope of the Bank's past due loan liability from investors.

For their part, Defendants advanced a theory throughout the trial that their statements were not actually false because the SEC's and Federal Reserve's reporting instructions were

---

[2] Count Three charges only the Bank, but the Bank was dismissed as a defendant before trial.

[3] "To establish a violation of § 1001, the government [i]s required to prove each of the following five elements: (1) that [the accused] made a statement or representation; (2) that the statement or representation was false; (3) that the false statement was made knowingly and willfully; (4) that the statement or representation was material; and (5) that the statement or representation was made in a matter within the jurisdiction of the federal government." *United States v. Moyer,* 674 F.3d 192, 213 (3d Cir. 2012). The conspiracy, securities fraud, and false certification charges proceeded on the theory that Defendants' exclusion of the waived loans from those they reported as "past due," amounted to a false statement.

10

ambiguous and, under an objectively reasonable interpretation of those instructions, Defendants were not required to report the waived loans as "past due." The District Court's first ruling relating to this theory came in response to the Government's motion to exclude the OTS Q&A. In ruling that the OTS Q&A could be introduced only with respect to Defendants' affirmative defense of good faith—relevant to scienter—but not with respect to the element of falsity, the District Court ruled that "the applicable reporting requirements [we]re [not] ambiguous." A4. And even if there were ambiguity in the definition of "past due," the Court concluded, the interpretation presented in the OTS Q&A—that a loan that has been "informal[ly] exten[ded] . . . when the bank has agreed to accept interest payments until the property is rented or sold" is not "past due," A12509—would not be "a reasonable interpretation" of the call report instructions because an "informal" extension would be akin to a "grace period," which the instructions made clear could not be taken into account. A6. Accordingly, the Court ruled that insofar as the OTS Q&A had suggested that "a bank need not execute legal documents for the status of a loan to change for past due reporting documents," OTS provided an unreasonable interpretation of the term "past due" that the jury should not consider relevant to the reporting requirement or the Government's burden to prove falsity. A6–7.

The issue of how to determine whether the Bank's "past due" reporting was false returned when it came time for jury instructions. Defendants urged the District Court to instruct the jury that "[t]o prove that any statement was false, the government must prove beyond a reasonable doubt that the statement was not true under any reasonable interpretation of the[] reporting standards," regardless what "any defendant actually believed." A1251; *accord* A1228–29, A1262, A1277–78, A1300. They also asked that the jury be instructed to consider the OTS Q&A when ascertaining the "reasonable interpretation[s]" of what "past due" meant. *See, e.g.*, A1278.

The Court denied both requests. Instead, the Court gave three falsity instructions. In the first, it called the jury's attention to the Fed's call report instructions, emphasizing that a loan's past due status "should be determined in accordance with its contractual repayment terms" excluding "grace periods," A7624–25, and reading aloud to the jury the third and

11

fourth circumstances. In the second, the Court called the jury's attention to the SEC's requirement to state "loans which are contractually past due . . . as to principal or interest payments." A7627. And in the third, the Court instructed the jury that "[a] statement . . . is false if it is untrue when made, and if the person making the statement . . . or causing it to be made knew it was untrue at the time." A7646. The Court did not instruct that the Government must prove falsity under any reasonable interpretation of "past due," nor did it refer to the OTS Q&A in any of its instructions.

The jury found defendants guilty on all counts. These appeals followed.

## II. DISCUSSION[4]

Defendants challenge the sufficiency of the evidence supporting their convictions, asserting that the Government failed to prove beyond a reasonable doubt that their statements were actually "false."[5] In doing so, they raise an issue of first impression in this Circuit as to the prosecution's burden to prove that a statement was "false" in response to an ambiguous reporting requirement: Must the prosecution prove the statement false under each objectively reasonable interpretation of that reporting requirement, as Defendants argue and as several of our sister circuits require? Or is it enough, as the Government contends, for the prosecution to prove that a statement is false under *one* reasonable interpretation, as long as a defendant accepted that interpretation at the time she made the statement? For the following reasons, we agree with Defendants that the former is the proper burden and join our sister circuits in holding that the prosecution must prove a statement false under each objectively reasonable interpretation of an

---

[4] The District Court had jurisdiction under 18 U.S.C. § 3231, and we have appellate jurisdiction under 28 U.S.C. § 1291.

[5] Defendants also argue that insufficient evidence supports the jury's findings that they possessed the requisite scienter. Because we reverse on other grounds, we need not address this argument with respect to Defendants' false statement and certification convictions.

12

ambiguous reporting requirement. We first address the Government's burden to prove falsity in the face of an ambiguous reporting requirement and then, reviewing the evidence in light of this burden, conclude the evidence was insufficient to support Defendants' convictions. Because this is fatal to the false statement counts of the Indictment, we will reverse those convictions. And because we conclude this error was not harmless, we will vacate Defendants' remaining convictions and remand for retrial on those counts.

### A. The Government's Burden to Prove Falsity

We begin with the Government's burden to prove the falsity element of the charged offenses, a matter over which we exercise plenary review. *See United States v. Rodriguez*, 342 F.3d 296, 298 (3d Cir. 2003). We address four issues: (1) the Government's contention that we have previously decided this issue in its favor; (2) why a defendant's subjective belief that a statement is false cannot satisfy the objective falsity element consistent with due process; (3) the proper burden of proof; and (4) whether reasonableness in this context is a question for the jury or the judge.

### 1. The Government's burden to prove falsity in the face of an ambiguous reporting requirement is a matter of first impression in this Circuit.

The Government argues, drawing on a line of cases dealing with "fundamental ambiguity" in the context of perjury and false statements under § 1001, that—short of a "fundamental" ambiguity—we have held ambiguity irrelevant to the element of falsity. That assertion misapprehends the development of our case law to date.

In one line of cases, we have addressed the prosecution's burden to prove falsity in the absence of ambiguity. In run-of-the-mill cases where there is no dispute over the meaning of the question or reporting requirement to which a defendant responded, proving falsity is straightforward: A statement is false if it is "untrue." *United States v. Castro*, 704 F.3d 125, 139 (3d Cir. 2013). And as a necessary corollary, a statement that is "literally true . . . is, by definition, not false." *Id.*

13

In another line of cases, we have discussed the effect of "fundamental ambiguity" on scienter. In the context of perjury and false statement convictions, we have held that "if a question is excessively vague or 'fundamentally ambiguous,' then the answer to such question may not, as a matter of law, form the basis of a perjury or false statements prosecution." *United States v. Ryan*, 828 F.2d 1010, 1015 (3d Cir. 1987) (citations omitted), *abrogated in other part by United States v. Wells*, 519 U.S. 482 (1997). We have consistently framed this rule as one that screens out perjury and false statement charges for which a jury could never determine "which construction the defendant placed on the question" and, consequently, whether that defendant intended to give a false answer.[6] *Id.* And most recently, in *United States v. Hird*, 913 F.3d 332 (3d Cir. 2019), we reiterated that fundamental ambiguity requires a court to "disturb a jury's determination" if "it is entirely unreasonable to expect that the defendant understood the question posed to him" and characterized our inquiry on appeal as looking to whether there was sufficient evidence that the defendant intended to perjure because she "understood the question well enough to give an answer that he or she knew to be false." *Id.* at 346 (internal quotation marks and citation omitted); *see id.* at 349 (finding a question not fundamentally ambiguous because the evidence at trial "would give any reasonable fact finder more than enough basis to conclude that the witness

---

[6] We first adopted this rule, albeit without yet using the phrase "fundamentally ambiguous," in *United States v. Slawik*, 548 F.2d 75 (3d Cir. 1977), where we ordered dismissal of a perjury indictment because it was "premised . . . on questions that were deliberately artless and vague" and thus "it was entirely unreasonable to expect that the defendant understood the questions posed to him." *Id.* at 86. Even with this category of questions, however, the mere fact that a question was fundamentally ambiguous does not mean a statement made in answer can never be false. The inquiry is necessarily fact-specific, ranging from adoptive admissions where the truth of the answer depends entirely on the clarity of the question, to freestanding or non-responsive statements included in the answer that may be false entirely independent of the question asked.

14

knew" the question had a certain meaning);[7] *see also United States v. Richardson*, 421 F.3d 17, 33 (1st Cir. 2005) ("A question that is truly ambiguous . . . can never provide a basis for a finding of perjury, as it could never be said that one intended to answer such a question untruthfully." (citation omitted)). But these cases all discussed the effect of "fundamental ambiguity"—not just arguable ambiguity—and they did so in the context of the element of scienter, not falsity.[8]

Neither line of cases resolved the effect of arguable ambiguity on the issue we confront today: the Government's burden to prove falsity. The closest we came before today was in *United States v. Syme*, 276 F.3d 131 (3d Cir. 2002). There, the defendant was charged with fraudulently billing Medicare and Medicaid for ambulance services as if the vehicles had their "home station" in Pennsylvania when in fact the "home stations" were in other states. *Id.* at 142. Like Defendants here,

_____

[7] We note that *Hird's* application of the fundamental ambiguity standard on sufficiency of the evidence review, *see* 913 F.3d at 346–47, is in some tension with our earlier fundamental ambiguity cases framing the standard as one to be applied when a defendant moves to dismiss an indictment, *see, e.g.*, *United States v. Serafini*, 167 F.3d 812, 814, 820 (3d Cir. 1999). Because this tension concerns only the Government's burden to prove scienter—an element of the offense not at issue here—we leave its resolution for another day.

[8] We recognize that the distinction between questions considered typically or "arguably ambiguous" and those considered "fundamentally ambiguous" can be somewhat elusive, with the latter descriptor in some sense, conclusory. Consistent with the use of these terms in the case law, however, the difference seems to be that an ambiguous question as typically understood is "open to more than one interpretation," but it is also capable—by reference to context or other interpretative tools—of taking on one of them. *Ambiguous*, *Lexico.com*, https://www.lexico.com/definition/ambiguous (2020). In the case of "fundamental ambiguity," on the other hand, there is no rational basis for making that choice. For purposes of this opinion, we will use the term "arguably ambiguous" or simply "ambiguous" to refer to this type of question, as opposed to a "fundamentally ambiguous" question.

15

the *Syme* defendant challenged his false statement conviction on the ground that the term "home station" was not clearly defined. *Id.* at 142–43. We agreed that there was some ambiguity as to the applicable definition of home station, but we did not reach the question of the prosecution's burden to prove falsity in the face of an ambiguous reporting requirement. Because the prosecution presented alternative theories of guilt on the relevant counts and the jury had returned a general verdict, we reasoned—pursuant to the Supreme Court's decision in *Griffin v. United States*, 502 U.S. 46 (1991)—that the conviction could be reversed only if the "home station" theory of falsity was unconstitutional or legally invalid. *Id.* at 144. Concluding that the indictment did not "rel[y] on erroneous interpretations of the law" and that the district court had properly instructed the jury, we affirmed under *Griffin* and declined to reach whether the "home station" theory of falsity was supported by sufficient evidence. *Id*. at 146–48.

In sum, the Government's protestations to the contrary, we have not previously defined the Government's burden of proof to establish falsity in the face of ambiguous reporting requirements—much less resolved it in the Government's favor. That is a question of first impression in our Circuit and the one to which we now turn.

### 2. Due process demands that the falsity element stand independent of a defendant's subjective intent.

Relying on *Ryan* and *Hird*, the Government argues that as long as a question is not fundamentally ambiguous, the Government's burden as to falsity is simply to prove that a defendant understood an ambiguous reporting requirement to mean what the Government says it means and, in light of that meaning, intended to lie. Oral Arg. Tr. 109:15–16 (emphasizing "the construction that a particular [d]efendant placed on the term 'past due'"). This argument fails not only because it mistakes the case law on which it relies as addressing falsity instead of scienter but also, more fundamentally, because it collapses subjective falsity—the defendant's intent to lie—with objective falsity, i.e., the untruth of the statement in question. It thus runs up against the demands of due process: the prosecutor's duty to prove every element of the offense.

16

It is a bedrock principle that "the [Fourteenth Amendment's] Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970); *see also United States v. Nasir*, 982 F.3d 144, 162 (3d Cir. 2020) (en banc). Once the Government chooses to charge a particular offense, it undertakes the burden to "convince the trier of all the essential elements of guilt," *Winship*, 297 U.S. at 361, and if the prosecution fails to carry this burden, a conviction cannot stand. To allow otherwise would be to endorse conviction merely for "being bad"—an outcome abhorrent to the tenet that, in "our legal system," we convict people only of "specific crimes." *Castro*, 704 F.3d at 140. Indeed, we have repeatedly found that the prosecution's failure to prove an element of an offense is sufficiently grave to amount to a "miscarriage of justice" and a basis to reverse a conviction even on plain error review. *See, e.g.*, *Nasir*, 982 F.3d at 174; *United States v. Retos*, 25 F.3d 1220, 1231–32 (3d Cir. 1994); *United States v. Xavier*, 2 F.3d 1281, 1287 (3d Cir. 1993).

In the false statement context, because falsity and knowledge are distinct elements, this means the Government must prove a statement was false beyond a reasonable doubt, regardless of the defendant's subjective intent to lie. *Castro*, 704 F.3d at 139. If that were ever in question, any doubt was erased by our decision in *United States v. Castro*, where a defendant who believed he was lying when he told a federal agent he received money from a particular person, but who in fact had made a "completely, if unintentionally, accurate" statement because the money had actually come from an undercover agent, had been convicted of making a false statement under § 1001. *Id.* at 131, 133, 139–40. We reversed, holding that the defendant could not be convicted for making a false statement when his statement was literally true, even though he believed it was untrue. *Id.* Allowing a defendant's subjective intent to stand in for "a complete failure of proof" on the falsity element, we explained, would collapse the two elements and

17

relieve the prosecution of its constitutional burden to prove each and every element of the offense.[9] *Id.* at 139.

Yet the Government here advances the selfsame argument as the prosecution in *Castro*: that the actual falsity of Defendants' statements is "irrelevant," *Castro*, 704 F.3d at 140, as long as the Government can establish that there was a meeting of the minds between Defendants and their regulators on what constituted a "past due" loan and that Defendants intended to report falsely in light of this mutually understood meaning. Consistent with the Government's burden to prove each and every element of an offense beyond a reasonable doubt, we rejected this argument in *Castro* and do so again today. The Government must show not merely that a defendant subjectively intended to lie, but also that the statement in question was objectively false.[10]

> **3. Where a reporting requirement is ambiguous, the Government bears the burden of proving falsity under each objectively reasonable interpretation of the requirement.**

Because we must define a standard for falsity independent of a defendant's subjective intent, we now turn to defining the Government's burden of proof where a reporting requirement is ambiguous. Here, we are guided by another due

---

[9] Nor does the text of § 1001 support a subjective-belief exception to the Government's burden to prove falsity. Because "[k]nowledge and belief are very different mental states" and Congress, in enacting § 1001, chose to criminalize only knowledge, § 1001 cannot support the conviction of a defendant who merely believes that his true statement is false. *Castro*, 704 F.3d. at 140 (citation omitted).

[10] As we recently put it in discussing the element of falsity under the False Claims Act, a requirement of "factual evidence that [the defendant] was making a *knowingly* false determination" in order to prove "factual" or "objective" falsity would "conflate[] the elements of scienter and falsity" and "read[] the scienter element out of the text of the statute." *United States v. Care Alternativeness*, 952 F.3d 89, 96 (3d Cir. 2020) (emphasis in original).

18

process principle: the requirement that potential defendants be given "fair warning" of what conduct could give rise to criminal liability.

It is "[a] fundamental principle in our legal system . . . that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Thus, "a conviction . . . fails to comply with due process if the statute or regulation under which it is obtained 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *Id.* (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)). This fundamental tenet ensures that a "statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997). Accordingly, as the Supreme Court explained in *Lanier*, "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope."[11] *Id.* at 266.

Fair warning principles apply with equal force when a defendant is criminally charged as a result of noncompliance with agency regulations or guidance. *See Fox Television Stations*, 567 U.S. at 253 (explaining the "due process concern[]" that "regulated parties should know what is required of them so they may act accordingly"). Thus, a conviction for concealing material facts in violation of 18 U.S.C. § 1001(a)(1)—another subsection of the statute under which Defendants were convicted for making false statements—cannot stand absent

---

[11] This is one of "three related manifestations of the fair warning requirement." *Lanier*, 520 U.S. at 266. The other two manifestations are the vagueness doctrine, which "bars enforcement of 'a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application,'" *id.* (quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926)), and the rule of lenity, which "ensures fair warning by so resolving the ambiguity in a criminal statute as to apply it only to conduct clearly covered," *id.*

fair notice of the legal duty to make the particular disclosure. *See United States v. Safavian*, 528 F.3d 957, 964–65 (D.C. Cir. 2008) (reversing a § 1001(a)(1) conviction because "vague" government guidance documents were insufficient to create a legal duty to disclose); *United States v. White Eagle*, 721 F.3d 1108, 1118 (9th Cir. 2013) (reversing a § 1001(a)(1) conviction when the regulation purportedly creating a duty to disclose did not "provide specifics on what kind of information should be reported or to whom"). Likewise, where neither the tax code, Treasury regulations, nor federal court cases create "a clear rule of law," there has been no fair warning and a tax evasion conviction cannot stand. *United States v. Harris*, 942 F.2d 1125, 1131–32 (7th Cir. 1991); *see also, e.g.*, *Sanders v. Freeman*, 221 F.3d 846, 852–53 (6th Cir. 2000); *United States v. Pirro*, 212 F.3d 86, 91 (2d Cir. 2000); *United States v. Mallas*, 762 F.2d 361, 364–65 (4th Cir. 1985).

Even in the civil context, fair warning requires that government agencies communicate their interpretation of their own regulations with "ascertainable certainty" before subjecting private parties to punishment under that interpretation. *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 249, 251 (3d Cir. 2015). This is because it is difficult for a private party to predict how an agency will interpret an ambiguous statute or regulation. *Id.* at 251–52. Whereas "courts generally resolve statutory ambiguity by applying traditional methods of construction" so that "[p]rivate parties can reliably predict the court's interpretation by applying the same methods," agencies are "often free to adopt *any reasonable construction*" and "may impose higher legal obligations than required by the best interpretation." *Id.* at 252. As a result, "[i]t is harder to predict how an agency will construe a statute or regulation at some unspecified point in the future, particularly when that interpretation will depend on the political views of the President in office at [that] time." *Id.* (second alteration in original) (internal quotation marks and citation omitted). And this is where due process steps in: Against the backdrop of that unpredictability, an agency must have clearly communicated its policies before a private party may be sanctioned—much less criminally prosecuted—for violating them.

Applying these fair warning principles here, we hold that where falsity turns on how an agency has communicated

20

its reporting requirements to the entities it regulates and those communications are ambiguous, fair warning demands that the Government prove a defendant's statement false under each objectively reasonable interpretation of the relevant requirements.[12] This standard ensures that the requisite notice will be given to potential criminal defendants making required reports to their regulators, for an ambiguous reporting requirement—one susceptible to an objectively reasonable interpretation under which a defendant's statement is true—does not "fairly disclose[]," *Lanier*, 520 U.S. at 266, to the defendant that her response, because false under a different reasonable interpretation, could give rise to criminal liability. That defendant cannot know with "ascertainable certainty," *Wyndham*, 799 F.3d at 251, whether her statement will be considered false. If a regulator fails to give fair warning, it may still succeed in a false statement prosecution—but only if it proves either that its interpretation is the only reasonable one or that the defendant's statement is false under each reasonable interpretation.

With this holding, we join our many sister circuits that have reached similar conclusions. *See United States v. Whiteside*, 285 F.3d 1345, 1351 (11th Cir. 2002) ("In a case where the truth or falsity of a statement centers on an interpretive question of law, the government bears the burden of proving beyond a reasonable doubt that the defendant's statement is not true under a reasonable interpretation of the law."); *United States v. Prigmore*, 243 F.3d 1, 17–18 (1st Cir. 2001) ("[T]here

---

[12] No doubt, under an objective standard, the determination here—as in other areas of the law that rely on an objective reasonableness standard—may take account of particular characteristics of the defendant by considering, for example, "what a reasonable person under the circumstances would believe or understand," *United States v. Berrios*, 676 F.3d 118, 137 (3d Cir. 2012), "prevailing professional norms," *Strickland v. Washington*, 466 U.S. 668, 688–89 (1984), and "the perspective of a reasonable [category of professional]" in the defendant's situation, *Kedra v. Schroeter*, 876 F.3d 424, 450 (3d Cir. 2017). Assessing reasonableness from "the perspective of a reasonable person in [the defendant's] position, considering 'all the circumstances,'" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998), however, is still an objective, not a subjective, inquiry.

has been no crime if the statements were not false . . . under an objectively reasonable interpretation of the law imposing the duty."); *United States v. Migliaccio*, 34 F.3d 1517, 1525 (10th Cir. 1994) ("[T]he government bears the burden to negate any reasonable interpretations that would make a defendant's statement factually correct where reporting requirements are ambiguous."); *United States v. Johnson*, 937 F.2d 392, 399 (8th Cir. 1991) ("[T]he government must negative any reasonable interpretation that would make the defendant's statement factually correct."); *cf. United States v. Jones*, 664 F.3d 966, 977 (5th Cir. 2011) (concluding that where defendants claim they "reasonably believed" their statements were legal, "the Government must show that [they] knew that their claims were false by proving [their] interpretation of the law was not reasonable").[13]

Of course, by adopting this standard as to falsity, we do not suggest that the ambiguity of a reporting requirement or the reasonableness of an alternative interpretation is irrelevant to mens rea; to the contrary, a defendant may well argue she lacked scienter because she reasonably relied on an alternative interpretation. But we do reject the Government's positions that ambiguity is relevant exclusively to scienter and that the

---

[13] Two Courts of Appeals have suggested, in false statement cases involving application forms, that as long as there is sufficient evidence that the Government and the defendant had the same meaning in mind, the prosecution has satisfied its burden to prove falsity. *See United States v. Sarwari*, 669 F.3d 401, 403, 408–09 (4th Cir. 2012) (involving the term "father" on a passport application); *United States v. Camper*, 384 F.3d 1073, 1074, 1076 (9th Cir. 2004) (involving a question about a firearm possession conviction on a security clearance application). But these cases do not grapple with falsity at all—only with scienter. *See Sarwari*, 669 F.3d at 407 (explaining that the jury's role is to "determine[] whether the defendant knew his statement was false"); *Camper*, 384 F.3d at 1076 (explaining that the jury "decides which of the plausible interpretations of an ambiguous question the defendant apprehended and responded to"). In any event, for the reasons we have explained, we reject that approach as collapsing falsity and scienter in contravention of due process.

22

decisions of our sister circuits support that proposition. They do not.

As our sister circuits have made clear and as fair warning demands, ambiguity is relevant to falsity in its own right. The Eleventh Circuit in *Whiteside* explicitly applied the standard we adopt today to hold that the government failed to "prove[e] the *actus reus* of the offense—actual falsity," 285 F.3d at 1353, and the Eighth Circuit has recognized for decades that "in carrying out [its] burden [to prove falsity], the government must negative any reasonable interpretation that would make the defendant's statement factually correct," *United States v. Anderson*, 579 F.2d 455, 460 (8th Cir. 1978). Although the First and Tenth Circuits have articulated this standard primarily in the context of addressing requested jury instructions going to the knowledge element, both have also explicitly linked it to falsity. *See Prigmore*, 243 F.3d at 17–18 (relying on the general rule that a statement is not "fraudulent" if it is "not in fact false under an objectively reasonable interpretation" of a reporting requirement (citing *United States v. Rowe*, 144 F.3d 15, 21–23 (1st Cir. 1998))); *Migliaccio*, 34 F.3d at 1525 (observing, with respect to falsity, that "the Government bears the burden to negate any reasonable interpretations that would make a defendant's statement factually correct where reporting requirements are ambiguous" (citing *United States v. Anderson*, 579 F.2d 455, 460 (8th Cir. 1978), and *United States v. Race*, 632 F.2d 1114, 1120 (4th Cir. 1980))).

In sum, an ambiguous reporting requirement is not necessarily fatal to a false statement conviction. But to prove a statement in response to that requirement false, the Government must prove either (a) that its interpretation is the only objectively reasonable interpretation and that, under this interpretation, the defendant's statement was false, or (b) that the defendant's statement was false under each alternative, objectively reasonable interpretation. Put another way, if the Government cannot prove beyond a reasonable doubt that a defendant's statement was false under each objectively reasonable interpretation of an ambiguous reporting requirement, it cannot prove the element of falsity.

23

### 4.    Reasonableness is for the jury, not the judge.

When it comes to determining whether it has met its burden, the Government argues that reasonableness must be a question of law for the judge, not the jury, because "courts, not juries, must determine the scope of a [statutory or regulatory] provision." Appellee's Br. 70 (quoting *Obasi Inv. Ltd. v. Tibet Pharm., Inc.*, 931 F.3d 179, 188 (3d Cir. 2019)); *see also* Oral Arg. Tr. 81:4–18 (contending that the judge must construe reporting requirements as "legal concept[s]" and that the jury's role is limited to "dispos[ing] of any genuine issues of material fact" based on those concepts). We disagree.

The question is not the legally correct interpretation of a requirement, but rather whether a reasonable person in the defendant's position could interpret the reporting requirement only in the way urged by the Government or also in a way that would make the defendant's responses true.[14] *Cf. Wyndham*, 799 F.3d at 252 (recognizing a difference between how an agency interprets ambiguous statutes and regulations and how a court might interpret those same sources). And this type of reasonableness determination is one that juries routinely perform. As the Supreme Court recently observed, "we have long recognized across a variety of doctrinal contexts that, when the relevant question is how an ordinary person or community would make an assessment, the jury is generally the decisionmaker that ought to provide the fact-intensive answer." *Hana Fin., Inc. v. Hana Bank*, 574 U.S. 418, 422 (2015); *id.*

---

[14] For that reason, the reasonableness inquiry goes beyond the purview of the judge to resolve "disputes regarding the meaning of federal statutes and federal regulations," *Bonkowski v. Oberg Indus., Inc.*, 787 F.3d 190, 203 (3d Cir. 2015). And because reasonableness is a question of fact, it does not require the jury to "constru[e]" highly technical "written instruments," *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388 (1996). The evidence here, for example, consists of two sets of written instructions to banks that, although dry, are written in relatively plain language and do not rely on any industry-specific terms of art or legal terminology.

(collecting cases).[15]  That is no less true when the question is the "construction of an arguably ambiguous" question or reporting requirement.  *Slawik*, 548 F.2d at 86 (citation and internal quotation omitted).

Of course, this does not mean that "ambiguous questioning [is] a safe conduct for perjury."  *Id.*  It means merely that "when an answer would be true on one construction of an arguably ambiguous question but false on another," *id.*, the jury must decide whether the Government has satisfied its burden to prove that its interpretation "is the only reasonable interpretation," *id.* at 85.  And the Government has a range of tools at its disposal to meet that burden:  In some cases, it may be sufficient to point the jury to the plain text of the relevant reporting requirement; in others, additional evidence may be required, e.g., expert testimony establishing that the purportedly ambiguous requirement involved terms of art well known to a reasonable person in the defendant's field or could be reasonably interpreted only as the Government argues in a given business context.  *See, e.g.*, *Syme*, 276 F.3d at 143–44 (discussing testimony going to "a debate within the [relevant] community" about the meaning of a disputed reporting requirement); *Stawick*, 548 F.2d at 85 (distinguishing questions involving ambiguous terms from those involving "terms of art" or "words of common currency" in a given context).  But if the

---

[15] *See also Minarsky v. Susquehanna County*, 895 F.3d 303, 312–16 (3d Cir. 2018) (treating both whether an employer exercised reasonable care in detecting and eliminating sexual harassment and whether the employee acted reasonably in not availing herself of the employer's anti-harassment opportunities as jury questions); *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 506 (3d Cir. 2010) (treating whether a shift change was a reasonable accommodation under the ADA as a jury question); *Palmer v. Hendricks*, 592 F.3d 386, 396 (3d Cir. 2010) (treating the objective reasonableness of a defendant's belief that deadly force was necessary for self-defense as a jury question); *Jaasma v. Shell Oil Co.*, 412 F.3d 501, 512 (3d Cir. 2005) (treating whether a lessor made reasonable efforts to mitigate damages following a lessee's vacation of the premises as a question for the jury); *Rivas v. City of Passaic*, 365 F.3d 181, 198 (3d Cir. 2004) (noting that "[t]he reasonableness of [a police officer's] use of force is normally an issue for the jury").

Government cannot persuade the jury that its interpretation is the only reasonable interpretation in the circumstances, then to prove falsity, it must prove beyond a reasonable doubt that the defendant's statement was false under both interpretations. *See Syme*, 276 F.3d at 147 (holding that whether a disputed term in a false statements case had "a meaning" was a jury question); *see also, e.g.*, *United States v. Stacks*, 821 F.3d 1038, 1043–44 (8th Cir. 2016); *Whiteside*, 285 F.3d at 1352–53; *Migliaccio,* 34 F.3d at 1525.

This is not to say that there is no role for the judge. To the contrary, the judge's role in requiring the Government to meet its burden of proof is substantial. At the outset of a trial, the judge must determine, as a preliminary question under Federal Rule of Evidence 104, whether a reporting requirement is ambiguous—and, accordingly, the extent to which she will allow evidence and argument on the existence of an objectively reasonable interpretation under which a defendant's statement is true. If the judge determines that "administrative authority clearly answer[s] the dilemma the defendants faced," *Whiteside*, 285 F.3d at 1353–54, she might limit the introduction of evidence concerning ambiguity to purposes other than objective falsity. If she determines the question of ambiguity should reach the jury, she may be more receptive to admitting evidence on that subject, e.g., evidence of commonly known industry practices or terms of the trade. And in the latter case, she performs another essential check at the conclusion of the prosecution's case by assessing whether the Government has introduced sufficient evidence of falsity under each reasonable interpretation of the reporting requirement to survive a Rule 29 motion. *See* Fed. R. Crim. P. 29(a).

It is also incumbent on the judge, in the context of ambiguous reporting requirements, to provide the proper jury instructions on the Government's burden of proof with respect to falsity. These instructions mirror the instructions requested here and those included in the model jury instructions of many of our sister circuits, which require the jury to find whether "a particular question was ambiguous and the defendant truthfully answered one reasonable interpretation of the question" and

instruct the jury that, if so, that "answer would not be false."[16] *See* Fifth Circuit Pattern Jury Instructions: Criminal § 2.69 (2019); Tenth Circuit Pattern Jury Instructions: Criminal § 2.66 (2018); Eleventh Circuit Pattern Jury Instructions: Criminal § O64 (2020); *see also* Modern Federal Jury Instructions: Criminal ¶ 36.01[3] instruction 36-12 (2020) (including the same instruction for § 1001 offenses).

In sum, while the judge retains an essential role in a false statement trial involving an ambiguous reporting requirement, the question of the reasonableness of a proffered interpretation of that requirement is for the jury.

### B. Whether the Government Met Its Burden to Prove Falsity

Having defined the Government's burden to prove falsity, we now consider whether it carried that burden by introducing sufficient evidence at trial. When a defendant challenges the sufficiency of the evidence supporting her conviction, we "examine the totality of the evidence . . . in the light most favorable to the government," *United States v. Starnes*, 583 F.3d 196, 206 (3d Cir. 2009) (citation omitted), and "ask whether [the evidence] is strong enough for a rational trier of fact to find guilt beyond a reasonable doubt," *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013).

In view of what we have recognized today as the Government's burden of proof, we consider (1) whether the requirement to report "past due" loans was ambiguous, and, if so, (2) whether the Government proved beyond a reasonable doubt that Defendants' reports of "past due" loans were false under each reasonable interpretation.

---

[16] While we note that Defendants' requested instruction was a correct statement of the law, *United States v. Davis*, 183 F.3d 231, 250 (3d Cir. 1999), we need not reach whether any instructional error was harmless with respect to the false statement counts, *see United States v. Korey*, 472 F.3d 89, 96 (3d Cir. 2007), because we resolve this appeal on other grounds.

## 1. The relevant reporting requirements were ambiguous.

We agree with Defendants that, particularly given the OTS Q&A, both the SEC instructions and the call report instructions are ambiguous with respect to the "precise question at issue," *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984): whether mature loans with unpaid principals that were current for interest and in the process of being extended were to be reported as "past due."[17]

Begin with the SEC instructions, which directed the Bank to identify "[a]ccruing loans which are *contractually past due* 90 days or more as to principal *or* interest payments." A9219 (emphasis added). No further definition is given. Yet the Government—relying on what it characterizes as the "ordinary meaning" of past due—argues that the SEC instructions unambiguously require that "a borrower's failure to repay principal upon maturity . . . must be reported as past due." Appellee's Br. 53.

The Government's interpretation ignores the role of the word "contractually," which indicates that whether a loan is "past due" is determined by the terms of that particular loan's contract, not by any general meaning of "past due." And

---

[17] While each agency's instructions were arguably ambiguous standing alone, that ambiguity was undoubtedly compounded by consideration of those instructions together and in relation to the OTS Q&A. We observe that where a defendant is instructed to make nearly identical reports to multiple agencies that assign different meanings to substantially similar terms, we may—at least in the absence of clear and precise guidance by the particular agency whose instructions are at issue—consider those other instructions in determining both ambiguity and reasonableness. *See Whiteside*, 285 F.3d at 1352 (looking to regulations, administrative rulings, and judicial decisions to determine that there was no clear definition of a reporting requirement); *United States v. Maxwell*, 579 F.3d 1282, 1288 (11th Cir. 2009) (consulting state and federal regulations to identify ambiguity where the falsity of defendant's statement depended on parallel definitions in both types of regulations).

looking to the contracts here does not answer the question, but rather confirms that "reasonable people [can] differ," *Whiteside*, 285 F.3d at 1352–53, as to whether the waived loans were "contractually past due." After all, the Bank's contracts provide that failure to pay the principal at maturity would constitute a default—suggesting that mature loans with unpaid principals would be "contractually past due." But they also preserve the Banks's right to "renew or extend (repeatedly and for any length of time) th[e] loan . . . without the consent of or notice to anyone," A11756—giving the Bank a contractual right to, of its own accord, determine that a payment due under the contract is not due at all. Where, as here, the Bank exercised this right—by making arrangements with borrowers to "waive" the loan—whether the principal payment remained "contractually past due" is ambiguous to say the least.

The call report instructions too are ambiguous. To begin with, they track the language of the SEC instructions, stating that "[t]he past due status of a loan . . . [is] determined in accordance with its contractual repayment terms." A9622. They then attempt to clarify this ambiguity by addressing the "circumstances" in which loans "are to be reported as past due when either interest *or* principal is unpaid," including:

> (3) Single payment and demand notes, debt securities, and other assets providing for the payment of interest at stated intervals are to be reported as past due after one interest payment is due and unpaid for 30 days or more.

> (4) Single payment notes, debt securities, and other assets providing for the payment of interest at maturity are to be reported as past due after maturity if interest *or* principal remains unpaid for 30 days or more.

A9622–23. Yet neither of these circumstances clearly applies to loans—like those at issue here—that require interest to be paid both at regular intervals *and* at maturity. *See* A11755 (providing for the payment of both regular monthly payments and the payment of "all accrued unpaid interest" upon maturity). If Circumstance Three loans are required to be reported only when interest is unpaid for 30 days and Circumstance

29

Four loans are required to be reported when interest *or* the principal is unpaid 30 days, when should a loan that requires *both* interest to be regularly paid and interest to be paid at maturity be reported as past due?  The call report instructions give no "clear[] answer," *Whiteside*, 285 F.3d at 1352–53.

The Government's attempts to dispel this internal inconsistency in the call report instructions are unavailing.  First, the Government argues that Circumstance Four unambiguously applies to the waived loans because the loan agreements "required borrowers to continue making interest payments at and beyond maturity."  Appellee's Br. 58.  True enough, but by its plain language, Circumstance Three also applies to such a loan.  The Government next argues that only Circumstance Four applies to "matured loans."  *Id.* at 54.  But this reads a distinction between Circumstances Three and Four that is absent from the text, as nowhere do the call report instructions suggest that Circumstance Three applies only to loans before maturity and that, once a loan matures, Circumstance Four governs.

The Government goes on to fault Defendants for ignoring the definition of "nonaccrual" loan status in a different section of the call report instructions as applying when either the principal or interest is unpaid.  A9623.  Yet this only undermines the Government's point: "Past due" and "nonaccrual" are distinct terms of art, and the call report instruction's use of specific language in the "nonaccrual" definition suggests that this language was intentionally excluded from the "past due" definition.

As this discussion makes clear, the Government's reliance on the phrase "contractually past due" does not eliminate any ambiguity with respect to the types of loans at issue in this case.

### 2. The Government failed to prove that Defendants' interpretation of the relevant reporting requirements was unreasonable.

In light of this ambiguity, the Government bore the burden of proving beyond a reasonable doubt that either the alternative interpretation was unreasonable or that Defendants'

statements were false even under that alternative and reasonable interpretation. The Government concedes that the statements were not false under the interpretation Defendants have put forward and, given the record before us, no reasonable jury could conclude that their alternative interpretation was objectively unreasonable. To the contrary, with respect to the SEC instructions, it is quite plausible—given the terms of the loan agreements here—that the phrase "contractually past due" would exclude a mature loan that is treated as "waived" and that is in the process of being extended, even when no notice has been given the borrower. And, critically, other than relying on the purported "ordinary meaning" of "contractually past due," the Government offers no evidence that this interpretation is *unreasonable*—which it must in order to meet its burden to prove falsity.[18]

Turning to the call report instructions, the Government faces an even steeper climb. Defendants point out, quite logically, that Circumstances Three and Four can be reconciled by reading Circumstance Three as applying to loans that require interest payments pre-maturity and Circumstance Four as governing loans that require no interest payments until maturity (such as lump-sum "bullet" loans). And the OTS Q&A represented the position of another regulatory agency interpreting a nearly identically worded provision to mean that a loan that has been "informal[ly] exten[ded] . . . when the bank has agreed to accept interest payments until the property is rented or sold" is not "past due."[19] A12509. This is perfectly logical. *Accord*

_____

[18] Had the Government, for example, offered evidence that "contractually past due" was an industry term of art with a widely accepted meaning, it may have been able to convince a jury that the alternative interpretation was unreasonable. *See, e.g.*, *Syme*, 276 F.3d at 143–44. But in the absence of any such evidence, there was insufficient evidence from which a jury could conclude that the Government's interpretation is the only reasonable reading of the reporting requirement.

[19] Defendants challenge the exclusion of this evidence as to falsity on appeal. Because we find the convictions unsupported by sufficient evidence regardless, we need not reach whether limiting that evidence was an abuse of discretion. But we note that in future cases, another agency's interpretation of

31

*Whiteside*, 285 F.3d at 1352 (finding the defendants' interpretation reasonable where it "comport[ed] with [a] logical notion"). The Government, on the other hand, contends that only Circumstance Four applies to matured loans—even those governed by Circumstance Three before maturity—which renders Circumstance Three in large part redundant. But even assuming that interpretation is also reasonable, the Government has not put forth evidence from which the jury could find that this was the *only* reasonable interpretation.

In sum, the Government has failed to prove that its view of either the SEC or the Fed requirements is the only reasonable interpretation. Under these circumstances, it could prove falsity only by establishing that Defendants' statements were false under each reasonable interpretation. As the Government conceded at oral argument, however, it cannot do so, which is fatal to Counts Four through Nineteen. Because these counts require proof of falsity as an essential element and the Government cannot meet its burden of proof as to that element, we will reverse Defendants' convictions on these counts.

## C. The Remaining Securities Fraud Counts

Having addressed the convictions that rested on the alleged Waiver Practice scheme, we now turn to Defendants' convictions for Counts One (conspiracy) and Two (securities fraud). The Government argues these convictions can be salvaged because they also rested on a second theory of liability: the Bank's short-term extension en masse of loans approaching maturity, which the Government describes as a "mass-extension" or "'extend and pretend' scheme [linked] to the capital raise as an independent basis of guilt for the conspiracy and securities fraud offenses." Appellee's Br. 147, 148 n.45. The success of that argument, however, depends on: (1) whether the Government's invocation of the "extend and pretend" theory constructively amended the Indictment; (2) whether the Government presented sufficient evidence to support that theory; and (3) whether the erroneous jury instructions concerning

a parallel reporting requirement may be relevant to the reasonableness of a defendant's interpretation.

the falsity theory were harmless as to the alternate mass-extension theory. We consider these questions below.

### 1. The Indictment was not constructively amended.

An indictment is facially sufficient when it not only states the elements of the offense, but also "sufficiently apprises the defendant of what he must be prepared to meet, and . . . allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution." *United States v. Stevenson*, 832 F.3d 412, 423 (3d Cir. 2016) (citation omitted); *see* Fed. R. Crim. P. 7(c)(1) ("The indictment . . . must be a plain, concise, and definite written statement of the essential facts constituting the offense charged."). It is constructively amended, however, when it fails to provide that fair notice because the trial "broaden[s] the possible bases for conviction from that which appeared in the indictment." *United States v. McKee*, 506 F.3d 225, 229 (3d Cir. 2007) (citation omitted). According to Defendants, that is precisely what happened here: the mass-extension theory "first surfaced" at trial, and the only theory of liability identified in the Indictment relied on the "entirely different" Waiver Practice. North Br. 49, 52.

We disagree. Although the overriding focus of the Indictment is undoubtedly the Waiver Practice, both the facts of the mass-extension procedure and the fraud it allegedly furthered were introduced in the Indictment.[20] Under the heading of "the Mass Extension Process," the Indictment alleged that Defendants "embarked on a plan to mass-extend, through

_____

[20] The Government also urges us to look to the Bill of Particulars as further evidence that the short-term extensions were charged as a basis of liability for securities fraud (Count Two) and the conspiracy to commit it (Count One). We are skeptical that the Bill, which upon inspection says absolutely nothing about the mass extensions, would apprise the Defendants of the need to meet charges related to anything other than the Waiver Practice. However, we need not resolve the impact of the Bill of Particulars because we conclude that the Indictment, standing alone, sufficiently alleged the extensions as an independent theory of liability.

33

short-term extensions," loans that would otherwise come due at the end of 2009. A224–25. It also described how both the Waiver Practice and the mass extensions went undisclosed in the Bank's 2009 Form 10-K filing, how the 10-K was incorporated into the Bank's subsequent stock offering and attendant capital raise, and how Defendants did not inform the Fed about either the Waiver Practice or the mass extensions.

Defendants counter that these allegations were still insufficient to "inform [Defendants] of the specific offense . . . with which [Defendants were] charged," *Russell v. United States*, 369 U.S. 749, 765 (1962) (citation omitted), because they appear only in the Indictment's "Introduction," A210, and not in the text of Counts One and Two. But Count One specifically identifies false certifications in the 2009 Form 10-K as a result of "significant issues with the . . . proper extension" of matured loans as an overt act in furtherance of the conspiracy, A234, and each of the Counts expressly incorporates the introductory allegations. Granted, incorporating each and every paragraph of a lengthy introduction may not be the best way to give a defendant notice and may, as here, invite legal challenge. Nevertheless, "incorporat[ion] by reference" is permitted under the rules, Fed. R. Crim. P. 7(c)(1), and notice need not be ideal, only fair, as it was in this case: Although the Indictment did not expressly label the mass-extension scheme an alternative basis for liability, no such label was required because the Indictment "makes it sufficiently clear that [the] counts alleged the . . . theory." *Syme*, 276 F.3d at 151 (upholding an indictment that identified an alternate theory by only a two-letter abbreviation in a summary chart); *see also Stevenson*, 832 F.3d at 425 (noting that the only limitation on incorporation by reference is the requirement that it be "expressly done" (citation omitted)); *United States v. Vanderpool*, 528 F.2d 1205, 1206–07 (4th Cir 1975) (approving incorporation of introductory allegations by reference); *United States v. McGuire*, 381 F.2d 306, 319 (2d Cir. 1967) (permitting the use of introductory paragraphs that "specifically referr[ed] to the counts involved").

Because the Indictment made sufficiently clear that there were two bases for the conspiracy and securities fraud charges—the Waiver Practice on the one hand, and the mass-extension scheme on the other—the trial evidence and

34

argument concerning the extensions did not constitute a constructive amendment.

### 2. The mass-extension evidence was sufficient.

Defendants argue that, even if the securities fraud and conspiracy counts were properly charged, the evidence at trial was insufficient to establish the requisite scienter: intent to defraud.[21] *See* 18 U.S.C. § 1348; *United States v. Mahaffy*, 693 F.3d 113, 125 (2d Cir. 2012). We review a challenge to the sufficiency of the evidence by examining the totality of the evidence "in the light most favorable to the government," *Starnes*, 583 F.3d at 206 (citation omitted), and determining if that totality was sufficient for a rational jury to find the essential elements of the offense beyond a reasonable doubt, *Caraballo-Rodriguez*, 726 F.3d at 430.

While the evidence limited to mass extensions is indeed thin, we cannot say, viewing the record in the light most favorable to the Government, that no rational jury could have found the essential elements of conspiracy to commit securities fraud and securities fraud beyond a reasonable doubt. That evidence reflected that there was pressure to address mounting loans coming due in late 2009, that Bank executives (including Defendant North) scheduled a meeting in October 2009 to discuss "eliminat[ing] matured loans by" the end of the year, A10992, that extensions in the ordinary course of business would require full and time-consuming underwriting, and that, contrary to ordinary practice and Bank policy, hundreds of millions of dollars in soon-to-mature loans were extended on a short-term

---

[21] The securities fraud statute Defendants were convicted of violating, 18 U.S.C. § 1348, was only enacted in 2002 as part of the Sarbanes-Oxley Act, and we have yet to address its scienter requirement. Because our sister circuits are in agreement that § 1348 requires proof of intent to defraud, *see United States v. Hussain*, 972 F.3d 1138, 1146 (9th Cir. 2020); *United States v. Coscia*, 866 F.3d 782, 796 (7th Cir. 2017); *Mahaffy*, 693 F.3d at 125, and Defendants do not challenge that requirement (only the sufficiency of the proof to make it out), we will assume without deciding that § 1348 requires intent to defraud.

basis at the end of 2009 after only a "superficial review." A5761. In addition, the evidence showed that all Defendants were included on communications discussing these late 2009 extensions, that the effect of extending the maturity dates of these loans past the first quarter of 2010 was to render them current for purposes of reporting requirements at the 2009 year-end, that Defendants were involved in the creation of offering documents describing the Bank's financial health in connection with its February 2010 capital raise, and that those documents—which did not reflect the loans that would have matured but for the mass extensions—told prospective investors the Bank's past-due loan liability was even lower at the end of 2009 than the prior year.

Considering the totality of this evidence, a rational juror could conclude that Defendants had knowingly caused maturing loans to be extended in order to push them off the books for 2009 and conceal the poor financial health of the Bank from investors, and that they had knowingly joined an agreement to do so.[22] *See United States v. Williams*, 974 F.3d 320, 370 (3d Cir. 2020) ("The Government may prove the existence of a conspiracy entirely through circumstantial evidence." (citation omitted)). We therefore reject Defendants' sufficiency challenges to Counts One and Two.

### 3.      The falsity error was not harmless.

Although we are persuaded that the Government charged and adduced sufficient evidence to support a mass-

---

[22] Gibson separately argues that there was insufficient evidence that he joined a conspiratorial agreement. But the evidence showed that Gibson signed the 2009 Form 10-K and certified both the accuracy of its representations and the adequacy of the Bank's internal controls, that he was included in communications discussing the mass extensions, and that the Form 10-K he signed nevertheless asserted that the Bank's past-due loan liability decreased from the end of 2008 to the end of 2009. Viewing the totality of the evidence in the light most favorable to the Government, a rational juror could conclude that Gibson knowingly joined a conspiracy to defraud investors through the 2009 Form 10-K. Accordingly, we also reject Gibson's individual sufficiency challenge.

extension theory of liability, that does not end our analysis because Counts One and Two were also premised on the Waiver Practice theory, and where a conviction is supported by two independent theories, one of which is legally invalid, we must review the instructions for harmless error. *See Skilling v. United States*, 561 U.S. 358, 414 (2010); *Syme*, 276 F.3d at 144–45 (citing *Griffin v. United States*, 502 U.S. 46, 56 (1991). Specifically, "[w]e presume that such errors are not harmless unless it can be 'prove[d] beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *United States v. Wright*, 665 F.3d 560, 570–71 (3d Cir. 2012) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967) (internal quotation marks and citation omitted)) (second alteration in original). And that presumption is particularly difficult to overcome where "the government relies heavily on the improper theory, and the district court's instructions on the improper theory are 'interwoven' throughout the jury charge." *United States v. Andrews*, 681 F.3d 509, 522 (3d Cir. 2012).

The presumption is not overcome in this case. Although the Government maintains that it "scrupulously introduced evidence regarding each of [the] charged offenses" and carefully distinguished the extensions from the Waiver Practice as "an independent basis of guilt,"[23] Appellee's Br. 146–47, the trial record reflects that it repeatedly linked the Waiver Practice, mass extensions, and false statements together. In its opening, for instance, the Government asserted that "defendants switched their scheme" from waiving past due loans to "extend[ing] them on a short-term basis" with "the end result

---

[23] The Government concedes on appeal that the false statement counts relied only on the Wavier Practice. There is little in the record, however, to assuage our doubt that this distinction was clear to the jury. In particular, a number of the false statement counts related to statements made in the 2009 Form 10-K. It is unclear why the mass-extension theory could not support these counts as well; after all, the Government accused the Bank of hiding its past-due liability by, among other things, extending loans en masse without disclosing the practice in the Form 10-K. The Government's concession on this point is binding, but the possibility that the extensions could have supported at least some of the false statement counts further illustrates why the falsity error cannot be held harmless.

[being] the same," A2476, and that "there[ was] no carveout, no exception for [the short-term extensions] in the call report instruction," A2478. When the District Court asked the prosecutors to explain their position as to whether the mass extension of loans "didn't make them not past due," the Government responded that "the mass extension process was essentially a scheme to take what otherwise would have been reportable and reported as past due loans . . . and wiped them off reporting without having to deal with the waiver practice." A12631–32. And in its summation, it described the mass-extension process as the outgrowth of "the waived loans bec[o]m[ing] over-whelming," A7741, even going so far as to tell the jury that "mass extensions are basically just a new version of the waiver practice," A7746. In short, the Government not only relied heavily at trial on the legally erroneous Waiver Practice theory; it also failed to distinguish the evidence concerning that theory of fraud and the mass-extension scheme in its arguments before the District Court and the jury. As such, we cannot say with confidence that the erroneous instruction as to falsity did not "contribute to the [jury's] verdict." *Wright*, 665 F.3d 560, 570 (citation omitted).

The District Court's other instructions raise additional doubts. For instance, its instructions on Count Two (the securities fraud offense that also underlies Count One's conspiracy charge) are rife with references to the falsity of Defendants' representations about past due loans: They informed the jury that the "scheme to defraud" involved "false or fraudulent . . . representations" that were "contained in [the Bank's] SEC Form 10-K for 2009," A8354, defined the materiality of the statements at issue in Count Two by reference to "the alleged false statements regarding past due loans," A8359, and specifically enumerated the statements regarding past due loans in the 2009 Form 10-K that the Government contended were false, *see* A8363. And the jury here was given only a general unanimity instruction, not the specific instruction that might have avoided "a composite theory of guilt, producing twelve jurors who unanimously thought the defendant was guilty but who were not unanimous in their assessment of which act

38

supported the verdict."[24]  *United States v. Beros*, 833 F.2d 455, 462 (3d Cir. 1987).

In sum, where, as here, we confront "a trial environment that emphasized the [legally erroneous] theory," *Wright*, 665 F.3d at 572, and jury instructions where "the improper theory [was] 'interwoven' throughout the . . . charge," *Andrews*, 681 F.3d at 522, the presumption that this error was not harmless controls. Accordingly, we will vacate Defendants' convictions on Counts One and Two and remand for a new trial limited to the mass-extension theory of fraud.[25]  *See Syme*, 276 F.3d at 144–45.

*      *      *

For these reasons, we will reverse Defendants' false statement and certification convictions, remanding on those counts for the entry of judgments of acquittal, and we will vacate Defendants' convictions for conspiracy and securities fraud, remanding on those counts for a new trial.

---

[24] Ordinarily, a general unanimity instruction will suffice to "ensure that the jury is unanimous on the factual basis for a conviction, even where an indictment alleges numerous factual bases for criminal liability." *United States v. Gonzalez*, 905 F.3d 165, 184 (3d Cir. 2018) (internal quotation marks and citation omitted).  However, we have long recognized an exception to this rule and the propriety of specific instructions "where the complexity of the case, or other factors, creates the potential that the jury will be confused."  *United States v. Beros*, 833 F.2d 455, 460 (3d Cir. 1987).

[25] Defendants also challenge their convictions on Counts One and Two on the basis of an alleged prejudicial variance and cumulative error.  As we vacate and remand in any event, we need not address those arguments.